**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| David Monson and Wayne Hauge, | ) | |
| | ) | |
| Plaintiffs, | ) | **ORDER GRANTING DEFENDANTS'** |
| | ) | **MOTION TO DISMISS** |
| vs. | ) | |
| | ) | Case No. 4:07-cr-042 |
| Drug Enforcement Administration and | ) | |
| United States Department of Justice, | ) | |
| | ) | |
| Defendants. | ) | |

_____

## <u>INTRODUCTION</u>

In this case, two North Dakota farmers seeking to cultivate industrial hemp have sought a declaration that they cannot be criminally prosecuted under the federal Controlled Substances Act, 21 U.S.C. § 801 <u>et</u> <u>seq.</u> The issue before the Court is a question of law, namely, whether the Controlled Substances Act applies to the proposed cultivation of industrial hemp pursuant to North Dakota's new state regulatory regime.

Marijuana and industrial hemp have similar characteristics but far different applications. The industrial hemp plant is of the same species of plant as marijuana--Cannabis sativa L.--but one that has been bred to a low concentration of the psychoactive element of marijuana: tetrahydrocannabinol or THC. <u>See</u> N.D.C.C. § 4-41-01(limiting industrial hemp to a THC level of no more than three-tenths of one percent). THC is the compound that causes the "high" associated with the recreational use of the street drug marijuana. The stalk, fiber, sterilized seed, and oil of the industrial hemp plant, and their derivatives, are legal under federal law, and those parts of the plant are expressly excluded from the definition of "marijuana" under the Controlled Substances Act, 21 U.S.C. § 802(16). This statutory exclusion has allowed for the widespread use and trade of hemp

stalk, fiber, and sterilized hemp seed and seed oil.  These hemp commodities are sold throughout the world.

In 1999, the State of North Dakota enacted a law authorizing the cultivation of industrial hemp so that its farmers could supply the legal parts of the plant--stalk, fiber, seed and oil--that would otherwise have to be imported from other countries.  N.D.C.C. §§ 4-41-01, 4-41-02, 4-05.1-02, 4-05.1-05, 4-09-01(21)(a), 12-60-24(2)(b), and N.D. Admin. Code, Article 7-14.  The state regulatory regime provides for the licensing of farmers to cultivate industrial hemp; imposes strict THC limits precluding any possible use of the hemp as the street drug marijuana; and attempts to ensure that no part of the hemp plant will leave the farmer's property other than those parts already exempt under federal law. The plaintiffs are two North Dakota farmers who have received state licenses, have an economic need to begin cultivation of industrial hemp, and apparently stand ready to do so but are unwilling to risk federal prosecution of possession for manufacture or sale of a controlled substance.  See Docket No. 13, Affidavit of David Monson, Ex. A; Affidavit of Wayne Hauge, Ex. B.  The farmers seek a declaratory judgment that the Controlled Substances Act does not prohibit their cultivation of industrial hemp pursuant to their state licenses.

## I.      THE CONTROLLED SUBSTANCES ACT

The Controlled Substances Act ("CSA"), 21 U.S.C. § 801 et seq., establishes a comprehensive federal scheme to regulate controlled substances.  The CSA makes it unlawful to "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense" any controlled substance, "[e]xcept as authorized by [21 U.S.C. §§ 801-904]."  21 U.S.C. § 841(a)(1). Under the CSA, "manufactur[ing]" includes "production," 21 U.S.C. § 802(15), which

2

includes "planting, cultivation, growing, or harvesting" a controlled substance, 21 U.S.C. § 802(22). The CSA makes it a crime to possess any controlled substance except as authorized by the Act.

The CSA establishes "a 'closed' system of drug distribution for legitimate handlers" of controlled substances.  H.R. Rep. No. 91-1444,  at 6 (1970), as reprinted in 1970 U.S.C.C.A.N. 4566, 4571-72. To effectuate that closed system, the CSA "authorizes transactions within 'the legitimate distribution chain' and makes all others illegal." United States v. Moore, 423 U.S. 122, 141 (1975) (quoting H.R. Rep. No. 91-1444  (1970).  The restrictions the CSA places on the manufacture, distribution, and possession of a controlled substance depend upon the "schedule" in which the drug has been placed. See 21 U.S.C. §§ 821-29.  The CSA establishes five "schedules" of controlled substances differentiated by the scheduled drug's potential for abuse, its usefulness in medical treatment, and the potential consequences if abused.  21 U.S.C. § 812(b).

A controlled substance is listed in Schedule I, the most restrictive schedule, if it has "a high potential for abuse," "no currently accepted medical use in treatment in the United States," and "a lack of accepted safety for use . . . under medical supervision."  21 U.S.C. § 812(b)(1).  Under the CSA, any person who seeks to manufacture, distribute, or possess a Schedule I controlled substance must apply for and obtain a certificate of registration from the Drug Enforcement Agency (DEA). 21 U.S.C. §§ 822-23. When evaluating an application to manufacture a Schedule I substance, the DEA is required to consider such factors as the applicant's "maintenance of effective controls against diversion," "past experience in the manufacture of controlled substances," and criminal history. 21 U.S.C. § 823(a).

Since Congress enacted the CSA in 1970, "marijuana" (or "marihuana") and tetrahydrocannabinols (THC) have been classified as Schedule I controlled substances.  See

Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. No. 91-513, § 202, 84 Stat. 1249 (schedule I(c)(10), (17)); 21 U.S.C. § 812(c) (Schedule I(c)(10), (17)).  "Marijuana" is defined under the CSA to include "all parts of the plant Cannabis sativa L." except certain components of the plant such as mature stalks, fiber produced from the stalks, sterilized seeds, and oil from the seeds.  21 U.S.C. § 802(16).

The CSA contains congressional findings regarding the effects of drug distribution and use on the public health and welfare, and the effects of drug activity on interstate commerce. Congress found that "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people."  21 U.S.C. § 801(2). Congress then found:

> A major portion of the traffic in controlled substances flows through interstate and foreign commerce. Incidents of the traffic which are not an integral part of the interstate or foreign flow, such as manufacture, local distribution, and possession, nonetheless have a substantial and direct effect upon interstate commerce because -
>
> (A) after manufacture, many controlled substances are transported in interstate commerce,
>
> (B) controlled substances distributed locally usually have been transported in interstate commerce immediately before their distribution, and
>
> (C) controlled substances possessed commonly flow through interstate commerce immediately prior to such possession.

21 U.S.C. § 801(3).  Congress further found that "[l]ocal distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances," 21 U.S.C. § 801(4); that "[c]ontrolled substances manufactured and distributed intrastate cannot be differentiated from controlled substances manufactured and distributed interstate" and "[t]hus, it is not feasible to distinguish" between such substances "in terms of controls," 21 U.S.C. § 801(5); and that "[f]ederal

4

control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic," 21 U.S.C. § 801(6).

## II.      THE PLAINTIFFS' INTENDED GROWTH OF MARIJUANA

The plaintiffs, David Monson and Wayne Hauge, are North Dakota farmers.  Compl. ¶¶ 10-11.  Monson is also a member of the House of Representatives of the North Dakota Legislative Assembly.  Id. at ¶ 10.  In 1999, the Legislative Assembly passed a bill, introduced by Monson and others, legalizing the growth, possession, and sale of "industrial hemp" under North Dakota law.  See H.R. 1428, 56th Leg. Assem. (N.D. 1999); see also N.D.C.C. § 4-41-01. The statute defines "industrial hemp" as any Cannabis plant "having no more than three-tenths of one percent tetrahydrocannabinol [THC]," N.D.C.C. § 4-41-01.  THC is the primary psychoactive chemical constituent of the Cannabis plant.  66 Fed. Reg. 20,038, 20,041 (Apr. 18, 2001).  Contrary to the federal Controlled Substances Act, the North Dakota statute regulates Cannabis based on THC concentration.

In December 2006, the North Dakota Department of Agriculture finalized regulations governing the growth of "industrial hemp" pursuant to the new statute.  See N.D. Admin. Code 7-14-01-01 to 7-14-02-09. Recognizing that "industrial hemp" is regulated under federal law as "marijuana," a Schedule I controlled substance, the Department of Agriculture regulations originally provided that any person seeking to grow "industrial hemp" must, in addition to complying with North Dakota regulations, obtain a certificate of registration from the DEA.  Id. at 7-14-02-04(2), (3). However, on December 26, 2006, the Commissioner of Agriculture asked the DEA to waive the registration requirement for all farmers seeking to grow Cannabis pursuant to the new North Dakota

law.  See Docket No. 9, Ex. A (letter from Roger Johnson to Karen Tandy, DEA, Dec. 26, 2006).

In essence, the North Dakota Commissioner of Agriculture asked the federal government to forego

all regulation of marijuana that meets North Dakota's definition of "industrial hemp."

The DEA denied the Commissioner's request: "Congress expressly commanded the United

States Department of Justice to take the lead in controlling licit and illicit drug activity through

enforcement of the CSA. . . . [F]or DEA to simply turn over to any state the agency's authority and

responsibility to enforce the CSA . . . would be directly at odds with the Act."  See Docket No. 9,

Ex. B (letter from Joseph T. Rannazzisi, DEA, to Roger Johnson, Feb. 1, 2007).  The DEA also said

that, because "[f]ederal law uses the terms 'marihuana' and 'cannabis' and defines marihuana

without distinction based on THC content," the CSA requires a DEA registration for the cultivation

of marijuana for industrial purposes, regardless of the THC content.  Id.

On or about February 12, 2007, the North Dakota Department of Agriculture submitted

registration applications on behalf of Plaintiffs Monson and Hauge and, on March 5, 2007,

demanded resolution of those applications by April 1, 2007.  See Docket No. 9, Ex. C (letter from

Roger Johnson to Karen Tandy, DEA, Mar. 5, 2007).  The DEA responded that registration

applications require substantial time to process as they require a notice of application in the Federal

Register, a sixty-day response period for comments, a background investigation of the applicant, and

an onsite investigation of the manufacturing facilities.  See Docket No. 9, Ex. D (letter from Joseph

T. Rannazzisi, DEA, to Roger Johnson, Mar. 27, 2007).  The DEA informed the Department of

Agriculture that a decision within seven weeks, as requested, was unrealistic.  In response, the North

Dakota Legislative Assembly struck the DEA registration requirement from the new industrial hemp

law.  The revised statute now provides that "[a] license required by this section is not conditioned

6

on or subject to review or approval by the United States drug enforcement agency [sic]." 2007 N.D. Laws Ch. 20 § 7 (emphasis omitted).

The DEA contends that it continues to process the plaintiffs' registration applications. On June 1, 2007, it published notice of the plaintiffs' applications in the Federal Register. 72 Fed. Reg. 30,632 (June 1, 2007). On June 15, 2007, the DEA sent letters to both of the plaintiffs seeking additional information about their intended cultivation of marijuana. See Docket No. 9, Ex. E (letters from Gary G. Olenkiewicz, DEA, to Wayne L. Hauge and David C. Monson, June 15, 2007). The plaintiffs responded by filing this lawsuit. They claim that the DEA has misconstrued the Controlled Substances Act by requiring that persons who seek to grow marijuana for industrial purposes obtain DEA registrations. Oral arguments were presented at a hearing held on November 14, 2007.


### III.   STANDARD OF REVIEW

The defendants have moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) and the plaintiffs have cross-moved for summary judgment pursuant to Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only when the pleadings, deposition and affidavits submitted by the parties indicate no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law." Federer v. State of North Dakota, 447 F. Supp. 2d 1053, 1063 (D.N.D. 2006), quoting Uhiren v. Bristol-Myers Squibb Co., 346 F.3d 824, 827 (8th Cir. 2003).

IV.    **LEGAL DISCUSSION**

A.    **THIS COURT HAS JURISDICTION OVER THE ACTION**

The DEA contends that this Court lacks subject matter jurisdiction because the Controlled

Substances Act confers exclusive jurisdiction on the United States Court of Appeals to review any

"final decision" of that agency.  See 21 U.S.C. § 877.  However, the plaintiffs are not challenging

a "final decision" of the DEA, such as the denial of a license application or promulgation of a rule.

Rather, the plaintiffs are seeking a declaration that the Controlled Substances Act does not apply to

their planned cultivation of industrial hemp pursuant to North Dakota state law and, as a result, that

they cannot be prosecuted under the Act.  Thus, no "final decision" of the DEA is at issue and the

Court finds that 21 U.S.C. § 877 does not bar the plaintiffs from seeking relief in this Court.

21 U.S.C. § 877 provides as follows:

> All final determinations, findings, and conclusions of the Attorney General under this
> subchapter shall be final and conclusive decisions of the matters involved, except
> that any person aggrieved by a final decision of the Attorney General may obtain
> review of the decision in the United States Court of Appeals for the District of
> Columbia or for the circuit in which his principal place of business is located upon
> petition filed with the court and delivered to the Attorney General within thirty days
> after notice of the decision. Findings of fact by the Attorney General, if supported
> by substantial evidence, shall be conclusive.

21 U.S.C. § 877 cannot preclude a district court from assuming jurisdiction over an action against

the DEA where there is no "final decision" of that agency to be reviewed.  In PDK Labs Inc. v.

Reno, 134 F. Supp.2d 24, 29 (D.D.C. 2001), the district court held that it could assume jurisdiction

over a challenge to a DEA interpretative letter which did "not constitute a final determination,

finding or conclusion within the meaning of [21 U.S.C. §] § 877."  In Novelty, Inc. v. Tandy, 2006

U.S. Dist.  LEXIS 57270 (S.D. Ind. 2006), an unreported case, the district court held that it had

jurisdiction over a challenge to the DEA's practice of sending letters directing sellers of certain

chemicals to take certain actions with respect to transportation and storage.  The court held that "the most persuasive view is that § 877 does not apply where there has been no formal finding, conclusion or determination based on a record that provides a meaningful basis for judicial review."  Id. at *3.  See also Wedgewood Village Pharmacy, Inc. v. Ashcroft, 293 F. Supp.2d 462, 468 n. 2 (D.N.J. 2003) (stating that 21 U.S.C. § 877 did not deprive the district court of jurisdiction where there was no actual factual determination by the agency).

The DEA argues that if the challenged decision is not 'final,' the plaintiffs may not bring an action in any court.  This case does not involve a DEA "decision" of any kind.  Instead, the plaintiffs seek a declaratory judgment that the DEA cannot criminally prosecute them for cultivating industrial hemp under their state-issued licenses.  The Administrative Procedure Act and the Declaratory Judgment Act, 28 U.S.C. § 2201, confer authority on this Court to afford that remedy.  The Court has jurisdiction over the plaintiffs' claims for relief.

### B.    THE PLAINTIFFS HAVE STANDING

To establish standing, a plaintiff must demonstrate "it has suffered an 'injury-in-fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."  McClain v. Am. Economy Ins. Co., 424 F.3d 728, 731 (8th Cir. 2005) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc., 528 U.S. 167, 180-81 (2000)).  The DEA contends that Monson and Hauge cannot show such injury-in-fact because they have not been subjected to federal criminal prosecution nor threatened with prosecution.

It is well-established that the "[p]laintiffs . . . are not required to expose themselves to arrest or prosecution under a criminal statute in order to challenge a statute in federal court."  Arkansas

Right to Life State PAC v. Butler, 146 F.3d 558, 560 (8th Cir. 1998).  Rather, "[w]hen government action or inaction is challenged by a party who is a target or object of that action, as in this case, 'there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" Minnesota Citizens Concerned for Life v. Fed. Election Comm'n, 113 F.3d 129, 131 (8th Cir. 1997) (quoting Lujan v. DeFenders of the Wildlife, 504 U.S. 555, 561-62 (1992)).

Applying these principles, the First Circuit Court of Appeals in New Hampshire Hemp Council, Inc. v. Marshall, 203 F.3d 1, 4 (1st Cir. 2000), held that the plaintiff farmer had standing to seek a declaration that the Controlled Substances Act did not prohibit his proposed cultivation of industrial hemp.  Unlike this case, no state law authorizing the cultivation of industrial hemp was in effect.  Id. at 3.  As in this case, the DEA argued that the plaintiffs lacked standing to bring a pre-enforcement challenge.  Id. at 4.  The First Circuit Court of Appeals disagreed and held that the plaintiff farmer did have standing:

> We think that the threat of federal prosecution here is realistic.  [Plaintiff] Owen, a farmer as well as a legislator, proposes to grow cannabis sativa plants to produce industrial products if permitted to do so.  The DEA has made clear, both by its conduct in New Hampshire and elsewhere, that it views this as unlawful under the federal criminal statutes governing marijuana. . . .  Nor, as the medical-use controversy bears out, . . . is there any reason to doubt the government's zeal in suppressing any activity it regards as fostering marijuana use.

New Hampshire Hemp Council Inc., 203 F.3d 1, 5.

Here, the plaintiffs each went to the trouble to apply for and obtain a state license.  They are both experienced farmers and apparently know how to plant and harvest industrial hemp.  They have clearly stated that they intend to plant their first hemp crop, and have indicated where, when, and how they intend to grow hemp.  See Docket No. 13, Monson Aff. ¶¶ 2, 5, 6, 22; Hauge Aff. ¶¶

2-4,16.  Therefore, the plaintiffs are not alleging some kind of "subjective chill," nor are they seeking "an advisory opinion" about federal marijuana policy.  They arguably stand ready, willing, and able to cultivate industrial hemp under their state licenses and they face an imminent threat of federal criminal prosecution if they do so.  A "plaintiff who alleges a threat of prosecution that 'is not imaginary or wholly speculative' has standing to challenge the statute."  St. Paul Area Chamber of Commerce v. Gaertner, 439 F.3d 481, 485 (8th Cir. 2006) (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 302 (1979)).  For these reasons, the Court finds that the plaintiffs have standing to pursue their claim.

The DEA also contends that the claim is not ripe for adjudication because the two farmers, David Monson and Wayne Hauge, have not demonstrated any possible "hardship" from the withholding of Court consideration.  The DEA argues that the plaintiffs cannot demonstrate any hardship "justifying judicial review prior to DEA's resolution of their registration applications," and that if, "as Plaintiffs speculate, the DEA denies their registration applications, the plaintiffs may seek judicial review of that denial" in the Court of Appeals.  See DEA Brief, pp. 13-14.

That argument was squarely addressed and rejected by the First Circuit Court of Appeals in New Hampshire Hemp Council, supra, in which the plaintiff farmer had not even applied for a DEA license to cultivate hemp:

> As for ripeness, the issue posed . . . is an abstract one of statutory interpretation.
>
> The DEA points out that it can license marijuana production . . . and that Owen [the plaintiff farmer] has not sought a license.  But whether viewed as a ripeness objection or one based on a failure to exhaust remedies, the objection is unsound here, even if there were some realistic prospect of a license for Owen. Owen's position is that his proposed production of industrial products is not marijuana production under the statute and therefore not subject to the statute at all, whether as a prohibition or licensing scheme.  If he were correct, it is hard to see why he should be forced to apply for a license.

11

203 F.3d at 6.  The same holds true in this case.

To the extent that the DEA is contending that, having applied for a certificate of registration from the DEA, the plaintiffs should await the DEA's decision on those applications, the DEA is presumably raising the doctrine of failure to exhaust administrative remedies.  As the Court in New Hampshire Hemp Council explained, a party should not be required to apply for a license under a regulatory scheme that the party contends does not apply to his situation.  203 F.3d 1, 5.  More important, even if the doctrine of exhaustion were applicable, a "party may be excused from exhausting administrative remedies . . . if further administrative procedures would be futile."  Ace Prop. & Cas. Ins. Co. v. Fed. Crop Ins. Corp., 440 F.3d 992, 1000 (8th Cir. 2006).

It should be noted that the only reason the plaintiffs applied to the DEA for a certificate of registration is that formerly under North Dakota law, a farmer needed to obtain a DEA registration prior to obtaining a state license.  See N.D. Admin. Code § 7-14-02-04(2), (3) (repealed).  During the 2007 Legislative Session, and in response to the DEA's correspondence with state officials indicating the DEA's intention to review such license requests as if the plaintiffs were simply planning to grow the street drug marijuana, the state law was amended to eliminate the requirement that a DEA license be obtained prior to planting industrial hemp. H.B. 1020, 60th Leg. Assem. (N.D. 2007).  As a result, current North Dakota law does not require that the plaintiffs obtain a DEA license prior to growing industrial hemp. N.D.C.C. § 4-41-02(4).

It is apparent from the record that the DEA has, arguably, prejudged the merits of the registration applications by characterizing them as requests being submitted by "manufacturers of marijuana-which is the most widely abused controlled substance in the United States. . . ."  See Docket No. 9, Ex. B (letter from DEA to North Dakota Agriculture Commissioner Roger Johnson,

12

Feb. 1, 2007).  And as made clear by the Affidavit of Burton Johnson, see Docket No. 9, Ex. E, it

is unlikely the DEA will act promptly on the pending applications.  Professor Johnson states that

North Dakota State University (NDSU) was directed, by N.D.C.C. § 4-05.1-05, to "collect feral

hemp seed stock and develop appropriate adapted strains of industrial hemp containing less than

3/10 of one percent THC in the dried flowering tops."  Johnson Aff. ¶ 5.  He further explains that:

> Pursuant to this legislative mandate, NDSU submitted its own application to DEA
> for a registration for cultivation of industrial hemp for research purposes, on
> September 28, 1999....  NDSU proposed to plant 160,000 viable seeds to produce
> 144,000 hemp plants in the field, and to evaluate characteristics including
> emergence, growth and development, phenology, pest incidence, seed and biomass
> yield and seed and biomass quantity.

Id. ¶ 6.  Professor Johnson confirms that to date--nearly eight (8) years after its filing – the DEA has

not acted on NDSU's pending application.[1]  There appears from the record to be no legitimate

excuse for this unreasonable delay.

It is clear that the issue presented by the plaintiffs in this action may never be addressed and

resolved by the DEA through the registration and application process.  As a practical matter, there

is no realistic prospect that the plaintiffs will ever be issued a license by the DEA to grow industrial

hemp.  The futility of waiting until a registration application submitted to the DEA is acted upon is

apparent.  The legal argument that administrative remedies have not been exhausted is meritless.

The issue presented is a legal issue which is ripe for adjudication and fit for immediate judicial

resolution.

---

[1]On October 26, 2007, North Dakota State University filed an amicus brief in support of the plaintiffs' case.
See Docket No. 29.

### C.   THE CANNABIS SATIVA L. PLANT IS A CONTROLLED SUBSTANCE.

The plaintiffs argue that any Cannabis plant that falls within the definition of "industrial hemp" under North Dakota law is not a controlled substance under the Controlled Substances Act and, consequently, anyone seeking to grow such Cannabis plants need not obtain a DEA registration. See Compl. ¶ 7 (seeking declaration that "the CSA does not apply to the industrial hemp plants they seek to cultivate pursuant to state law"). However, the Eighth Circuit Court of Appeals has recently confirmed that the Controlled Substances Act unambiguously designates the Cannabis plant as a controlled substance and prohibits the growth of that plant without a DEA registration.

The starting point for any dispute over the meaning of a statute is the language of the statute itself. Schreiber v. Burlington N., Inc., 472 U.S. 1, 5 (1985). "[W]hen the terms of a statute are unambiguous, judicial inquiry is complete." United States v. Vig, 167 F.3d 443, 448 (8th Cir. 1999). In such instances, "legislative history and policy arguments are at best interesting, at worst distracting and misleading, and in neither case authoritative." N. States Power Co. v. United States, 73 F.3d 764, 766 (8th Cir. 1996). These principles control the statutory construction question presented in this case.

Under the Controlled Substances Act, marijuana is designated as a Schedule I controlled substance. 21 U.S.C. § 812 (Schedule I)(c)(10). The CSA defines "marijuana" as follows:

> [A]ll parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin. Such term does not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.

14

21 U.S.C. § 802(16).  This definition of "marijuana" unambiguously includes the Cannabis sativa L. plant and does not in any manner differentiate between Cannabis plants based on their THC concentrations.  Although the definition does exclude certain components of the plant, it is clear that a growing Cannabis plant falls within the definition of "marijuana."

In addition, the CSA designates "any material . . . which contains any quantity of . . . [t]etrahydrocannabinol[] [THC]" as a Schedule I controlled substance.  21 U.S.C. § 812 (Schedule I)(c)(17); see 21 U.S.C. § 881(g)(1) ("All species of plants from which controlled substances in schedules I and II may be derived which have been planted or cultivated in violation of this subchapter . . . may be seized and summarily forfeited to the United States").  The plaintiffs concede that the plant they intend to grow is Cannabis sativa L.  The plaintiffs also concede that the plant they seek to grow will contain some quantity of THC.  See Complaint, ¶ 14.  Whether viewed as marijuana, 21 U.S.C. § 812 (Schedule 1)(c)(10), or as THC-containing material, 21 U.S.C. § 812 (Schedule I)(c)(17), the plant the plaintiffs seek to grow is clearly a Schedule I controlled substance under the plain language of the Controlled Substances Act.  The language of the statue is unambiguous.  The proper venue to amend the statute is Congress and not the courts.

In a recent case identical in all relevant respects to this one, the Eighth Circuit Court of Appeals held that the Controlled Substances Act designates the Cannabis sativa L. plant, including that grown exclusively for industrial purposes, as a Schedule I controlled substance.  United States v. White Plume, 447 F.3d 1067, 1070-73 (8th Cir. 2006).  A careful overview of that case is warranted.

In 1998, the Tribe Council of the Oglala Sioux Tribe passed an ordinance permitting the growth of "industrial hemp."  Id. at 1069.  The ordinance defined "industrial hemp" as "all parts and

varieties of the plant Cannabis sativa . . . that are . . . cultivated and harvested for fiber and seeds and contain a [THC] concentration of one percent or less by weight." Id. The defendant, Alex White Plume, raised a Cannabis crop on federal trust land without a DEA registration. The government sent him a DEA registration application which he never completed. Instead of prosecuting, the government sought a declaratory judgment that the Cannabis plants White Plume cultivated were controlled substances under the CSA and sought to permanently enjoin him from growing such plants.

The defendant in White Plume argued, as the plaintiffs argue here, that the "industrial hemp" he was growing was not "marijuana" within the meaning of the CSA. The Eighth Circuit expressly rejected this argument: "The language of the CSA unambiguously bans the growing of marijuana, regardless of its use." 447 F.3d 1067, 1072. It was also argued that "industrial hemp" is not marijuana because it contains virtually no THC, making it incapable of having a high potential for abuse as required by the CSA for a drug in Schedule I. 447 F.3d 1067, 1072-73. The Eighth Circuit also rejected this argument: "[T]he CSA does not distinguish between marijuana and hemp in its regulation." Id. at 1073. The court further explained that "Schedule I(c) includes any material which contains any quantity of THC" and a growing Cannabis plant is therefore a Schedule I controlled substance. Id. Finally, the court considered the legislative history of the CSA but found "no evidence that Congress intended otherwise" than to ban the growth of all varieties of the Cannabis plant without a DEA registration. 447 F.3d 1067, 1072.

The federal courts that have considered this issue agree that Cannabis plants grown for industrial purposes and containing lower THC concentrations are "marijuana" within the meaning of the Controlled Substances Act. Hemp Indus. Ass'n v. Drug Enforcement Admin., 333 F.3d 1082,

1085 n.2 (9th Cir. 2003) ("The industrial hemp plant itself, which falls under the definition of marijuana, may not be grown in the United States. Therefore, the seeds and oil must be imported."); New Hampshire Hemp Council, Inc. v. Marshall, 203 F.3d 6 (1st Cir. 2000); Kiczenski v. Ashcroft, 2006 WL 463153, at *3 (E.D. Cal. Feb. 24, 2006), aff'd *sub nom*;  Kiczenski v. Gonzales, 237 Fed.Appx. 149, 2007 WL 1493 801 (9th Cir. May 16, 2007);

Other courts have also held in the context of sentencing that Cannabis plants are "marijuana" regardless of their THC concentration.  United States v. Curtis, 965 F.2d 610, 616 (8th Cir. 1992) (holding that male marijuana plants, which may have lower THC concentrations than female plants, are still marijuana plants for sentencing purposes); United States v. Traynor, 990 F.2d 1153, 1160 (9th Cir. 1993) (same), overruled on other grounds by United States v. Johnson, 256 F.3d 895 (9th Cir. 2001); United States v. Proyect, 989 F.2d 84, 88 (2nd Cir. 1993) (same and noting "the simple concept that 'a plant is a plant is a plant'"); United States v. Coslet, 987 F.2d 1493, 1496 (10th Cir. 1993) ("[T]he presence of THC is not required for a plant to be considered a marijuana plant."); see also United States v. Spann, 515 F.2d 579, 583-84 (10th Cir. 1975) ("Congress has in effect determined that possession of some quantity of 'marihuana,' regardless of its particular hallucinogenic qualities, is proscribed."); United States v. Northrop, 972 F. Supp. 183, 185 (W.D.N.Y. 1997) ("The presence of THC is not required for a plant to be considered marihuana under 21 U.S.C. § 802(16).").

Under the current state of the law in the Eighth Circuit, all varieties of the Cannabis sativa L. plant, regardless of the THC concentration and regardless of the use, are Schedule I controlled substances under the federal Controlled Substances Act.  Counsel for the plaintiffs acknowledged at the hearing on November 14, 2007, that there are currently no federal district or appellate courts

that have exempted industrial hemp from the Controlled Substances Act.  The fact that the North Dakota Legislative Assembly has chosen to regulate the growth of Cannabis in a manner contrary to federal law does not change its status as a Schedule I controlled substance under federal law.

### D.  THE CONTROLLED SUBSTANCES ACT DOES NOT VIOLATE THE COMMERCE CLAUSE.

The plaintiffs also seek a declaration that "interpreting the [CSA] as reaching state-regulated intrastate industrial hemp cultivation where the regulated parts of the plant do not enter interstate commerce would result in an unconstitutional exercise of congressional power beyond that authorized by the Commerce Clause of the U.S. Constitution."  Compl. ¶ 7.  In other words, the plaintiffs argue that, because the Cannabis plants they wish to grow would (theoretically) never leave the state of North Dakota, Congress may not regulate their growth.  The United States Supreme Court has recently rejected this argument.

In Gonzales v. Raich, 545 U.S. 1, 22 (2005), the United States Supreme Court held that Congress could, under the Commerce Clause, regulate marijuana that was grown and consumed locally for non-commercial, personal medicinal use.  It explained that "Congress has the power to regulate activities that substantially affect interstate commerce."  Id. at 17.  As part of this well-established power, Congress may "regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce."  Id. (citing Wickard v. Filburn, 317 U.S. 111, 128-29 (1942).

The Supreme Court noted congressional findings that local growth and distribution of controlled substances affect the interstate traffic in such substances. 545 U.S. 1, 12 n.20 (citing 21 U.S.C. § 801(1)-(6)).  It concluded that these findings were rational: "Given the enforcement

difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere, and concerns about diversion into illicit channels, we have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA."  545 U.S. 1, 22.

Gonzales v. Raich clearly disposes of the plaintiffs' argument that the Controlled Substances Act cannot be interpreted, consistent with the Commerce Clause, to reach the plaintiffs' intrastate cultivation and processing of marijuana.  Unlike the plaintiffs in Raich -- who sought to grow Cannabis for their personal medicinal consumption -- the plaintiffs in this case seek to grow Cannabis for commercial purposes.  See Compl. ¶¶ 16-18 (discussing global market for "industrial hemp" products); see also id. ¶¶ 38-51 (discussing the plaintiffs' intended sale of Cannabis components).  In other words, the challenged activity here is a "quintessential economic activity - a commercial farm."  See Raich, 545 U.S. at 20 (quotations omitted).  The Supreme Court has clearly established that Congress may regulate the production of commodities that remain intrastate as part of its regulation of the interstate market for those same commodities.  See United States v. Wrightwood Dairy Co., 315 U.S. 110, 121 (1942) (holding that Congress could regulate price of milk sold by producers whose business is entirely intrastate).  Second, the plaintiffs acknowledge that the components of their Cannabis plants are destined for interstate commerce.  Compl. ¶ 50. As such, there is no question that Congress may regulate the growth of the plant.  See Mandeville Island Farms v. Am. Crystal Sugar Co., 334 U.S. 219, 224-25, 235 (1948) (holding that Congress may regulate price of sugar beets that do not enter interstate commerce until processed into sugar).

The Supreme Court in Gonzalez v. Raich reaffirmed the well-established principle that Congress has the authority to regulate the growth of marijuana -- an "economic, commercial

activity" - under the Commerce Clause.  545 U.S. 1, 26; see United States v. Davis, 288 F.3d 359,

362 (8th Cir. 2002) (upholding CSA as valid exercise of congressional authority under Commerce

Clause).  Congress rationally concluded that the regulation of all Cannabis plants, regardless of their

THC content, was necessary to make the regulation of marijuana effective:

> It may be that at some stage the plant destined for industrial products [hemp] is
> useless to supply enough THC for psychoactive effects.  But problems of detection
> and enforcement easily justify a ban broader than the psychoactive variety of the
> plant.

United States v. White Plume, 447 F.3d 1067, 1076 (8th Cir. 2006).

The Eighth Circuit's recognition that the unregulated growth of low-THC Cannabis would

create enforcement difficulties is consistent with a report of the United States Department of

Agriculture -- cited by the plaintiffs in the Complaint, Compl. ¶ 19 -- regarding the "industrial

hemp" market.  The report noted:

> [T]he two varieties are indistinguishable by appearance. . . . [S]hort of chemical
> analysis of the THC content, there was no way to distinguish between marijuana and
> hemp varieties. . . . [P]lanting density and other production characteristics do not
> offer a reliable way to distinguish varieties for law enforcement purposes.

USDA, "Identification: Industrial Hemp or Marijuana?"  *Industrial Hemp in the United States:*

*Status and Market Potential* (Jan. 2000).  See Docket No. 9, Ex. F.  By regulating all Cannabis

plants, Congress vested the DEA with the authority to determine whether a particular proposal for

the growth of Cannabis is sufficiently controlled so as not to undermine the objectives of the

Controlled Substances Act.  Congress properly exercised its power to ensure that its regulation of

marijuana is effective.

Finally, any attempt to draw distinctions between Cannabis varieties for purposes of a

Commerce Clause analysis ignores the indisputable fact that the plaintiffs seek to engage in a

commercial enterprise, and one that will result in the introduction of goods into interstate commerce. Regardless of Congress' purpose, because growth of the Cannabis plant substantially affects the interstate market for commodities such as Cannabis fiber, seed, and oil, Congress may regulate that growth.   See United States v. Darby, 312 U.S. 100, 115 (1941) (upholding congressional establishment of labor standards for the production of goods that enter interstate commerce, regardless of Congress' purpose).


### V.   CONCLUSION

The Eighth Circuit Court of Appeals in United States v. White Plume recognized that the growing of industrial hemp may be a viable agricultural commodity and that there may be "countless numbers of beneficial products which utilize hemp in some fashion."  447 F.3d 1067, 1076 (8th Cir. 2006).  There seems to be little dispute that the retail hemp market is significant, growing, and has real economic potential for North Dakota.  Nevertheless, the Eighth Circuit has clearly and unequivocally held that industrial hemp is subject to the Controlled Substances Act.  The federal Controlled Substances Act does not distinguish between marijuana and industrial hemp in its regulation.  The farming of industrial hemp requires growing the entire marijuana plant which at some point contains psychoactive levels of THC.  Therefore, industrial hemp is considered to be a Schedule I controlled substance.  The Court so holds as a matter of law.

Industrial hemp may not be the terrible menace the DEA makes it out to be, but industrial hemp is still considered to be a Schedule I controlled substance under the current state of the law in this circuit and throughout the country.  Marijuana and industrial hemp are members of the Cannabis sativa L. plant species for which the Controlled Substances Act presently makes no

distinction.  The Court recognizes that at some stage in the process the plant may contain such low levels of THC that it would be impractical to use as a recreational street drug.  However, perceived problems relating to detection and enforcement seem to remain as does the current ban imposed by Congress and the Drug Enforcement Administration.

The policy arguments raised by the plaintiffs are best suited for Congress rather than a federal courtroom in North Dakota.  The undersigned is aware of recent efforts in Congress to exclude industrial hemp from the definition of "marijuana" as defined under the Controlled Substances Act.  The Industrial Hemp Farming Act of 2007 was introduced in the House of Representatives on February 13, 2007, and was specifically designed to address the current dilemma.  See House Resolution 1009.  Congress can best address this problem and passage of the Industrial Hemp Farming Act of 2007 would accomplish what the plaintiffs seek in this lawsuit.  Whether efforts to amend the law will prevail, and whether North Dakota farmers will be permitted to grow industrial hemp in the future, are issues that should ultimately rest in the hands of Congress rather than in the hands of a federal judge.

The Defendants' Motion to Dismiss (Docket No. 8) is **GRANTED**, and the Plaintiffs' Motion for Summary Judgment (Docket No. 11) is **DENIED** as moot.

**IT IS SO ORDERED.**

Dated this 28th day of November, 2007.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court